# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14cv2901

XTOMIC, LLC,
a Colorado limited liability company

      Plaintiff,

**v.**

ACTIVE RELEASE TECHNIQUES, LLC,
a Colorado Limited Liability Company;
ART CORPORATE SOLUTIONS, INC.,
a Colorado Corporation; and
ART BUSINESS SOLUTIONS, LLC,
a Colorado Limited Liability Company,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      For its Complaint and Jury Demand, Plaintiff Xtomic, LLC ("Xtomic" or "Plaintiff"), by and through its undersigned counsel, hereby states and alleges as follows:

## PARTIES

      1.      Plaintiff Xtomic, LLC ("Xtomic") is a limited liability company organized under the laws of the State of Colorado with its principal place of business at 801 South Tejon Street, Colorado Springs, Colorado 80903.

      2.      Defendant Active Release Techniques, LCC ("ART LLC") is a limited liability company organized under the laws of the State of Colorado with its principal office at 9240 Explorer Drive, Suite 210, Colorado Springs, Colorado 80920.

      3.      Defendant ART Corporate Solutions, Inc. ("ARTCS") is a corporation organized under the laws of the State of Colorado with its principal office at 9240 Explorer Drive, Suite 210,

Colorado Springs, Colorado 80920.

4.      Defendant ART Business Solutions, LLC ("ARTBS") is a limited liability company organized under the laws of the State of Colorado with its principal office at 9240 Explorer Drive, Suite 210, Colorado Springs, Colorado 80920.

5.      ART, ARTCS and ARTBS are collectively referred to herein as the "Defendants" or the "ART Companies."

## JURISDICTION AND VENUE

6.      This is an action regarding ownership of copyright and copyright infringement arising under the copyright laws of the United States, Title 17, United States Code. Original jurisdiction as to these claims in conferred exclusively to the Federal Courts by 28 U.S.C. §§ 1331 and 1338(a).

7.      Pursuant to 28 U.S.C. § 1391(b), the United States District Court for the District of Colorado is the appropriate venue for this action because it is the judicial district in which each of the Defendants reside and a substantial part of the events giving rise to Plaintiff's claims occurred in Colorado.

8.      The Defendants, directly or through intermediaries, makes, distributes, offers for sale or license, sells or licenses, and advertises its products and services in the United States, the State of Colorado and the District of Colorado.

## GENERAL ALLEGATIONS

*Background of Xtomic*

9.      Xtomic is a small, locally owned Colorado Springs computer software company, formed in 2000 and incorporated on December 1, 2000.

10.      Jay Ferguson ("Mr. Ferguson") and Keith Varney ("Mr. Varney") are Xtomic's

founders, owners and primary employees.

11.      Xtomic is a computer software and development company, primarily engaged in creating, developing and maintaining computer software, software applications, web-based applications, website development, e-commerce applications, data management, practice management applications,  and graphic design.

12.      Xtomic regularly performs services as an outside, third-party independent contractor for a number of different clients.

***Background Regarding the Creation of Active Release Techniques***

13.      In the mid 1980's, P. Michael Leahy, D.C. ("Dr. Leahy") purportedly developed a soft-tissue manipulation treatment technique he coined as Active Release Techniques ("ART").

14.      In or about 1993, Dr. Leahy opened up a clinic in Colorado Springs, Colorado and provided various services to his patients including, but not limited to, ART.

15.      In 1997, Mr. Leahy formed ART LLC with the intent of teaching other health-care professionals how to perform ART.

16.      Since its formation, ART LLC has purportedly trained over 15,000 professionals in ART (collectively, "ART Practitioners").  Being an ART Practitioner, in and of itself, does not create any contractual or special relationship with ART LLC; rather, it merely means that one is certified to perform ART.  Being ART certified is similar to being certified in CPR by the American Heart Association.

17.      In or about 2007, Dr. Leahy formed ARTCS as a vehicle to provide on-site ART services to various companies by coordinating contract ART services with ART Practitioners.

18.     In or about 2010, Dr. Leahy formed ARTBS to market practice management software to ART Practitioners.

***Xtomic's Work for ART LLC – The Admin Program***

19.     In 2002, ART LLC approached Xtomic about performing computer and IT services.  Later in 2002, ART LLC asked Xtomic to develop an online webcast forum for ART Practitioners.

20.     After Xtomic developed these web broadcasts, ART LLC asked Xtomic to perform various other contract services including, but not limited to, creating a website and an administrative management program (the "Admin Program").

21.     The Admin Program was generally intended to be a software program that assisted ART LLC in managing its clients, products, seminars, webinars and sales.

22.     Xtomic created the entire Admin Program and authored all of its source code. Xtomic performed these programming services as an outside, third-party independent contractor for ART LLC.

23.     Xtomic and ART LLC never executed a written contract for the creation of the Admin Program. Rather, Xtomic billed ART LLC on a monthly basis for the services it provided ART LLC.

24.     Xtomic and ART LLC never signed any service agreement, business agreement, confidentiality agreement, non-compete agreement, non-solicitation agreement or any similar agreement related to the Admin Program.

25.     Moreover, Xtomic has never assigned its copyright ownership in the Admin

Program to anyone including, without limitation, Dr. Leahy or any of the ART Companies.

26.     Pursuant to the federal the Copyright Act, 17 U.S.C. § 101 *et seq.* ("Copyright Act"), Xtomic owns, and has owned since its creation, the copyright in the Admin Program.

### Xtomic's Work for ARTCS LLC – the EPN Program

27.     In or about 2004, Dr. Leahy approached Xtomic to create a software program for ARTCS to assist ARTCS in providing on-site ART services to companies (the "EPN Program").

28.     The EPN Program was generally designed to be a web-based computer program that assisted ARTCS in creating time sheets and case notes for contracted ART Practitioners who provide on-site ART services to companies, as well as assisting with various billing tasks.

29.     Xtomic created the entire EPN Program and authored all of its source code. Xtomic performed these programming services as an outside, third-party independent contractor for ARTCS LLC.

30.     Xtomic and ARTCS LLC never executed a written contract for the creation of the EPN Program. Rather, Xtomic billed the ARTCS LLC on a monthly basis for the services it provided ARTCS LLC.

31.     Xtomic and ARTCS LLC never signed any service agreement, business agreement, confidentiality agreement, non-compete agreement, non-solicitation agreement or any similar agreement related to the EPN Program.

32.     Moreover, Xtomic has never assigned its copyrights in the EPN Program to anyone including, without limitation, Dr. Leahy or any of the ART Companies.

33.     Pursuant to the Copyright Act, Xtomic owns, and has owned since its creation, the

copyright in the EPN Program.

***Xtomic's Development of its own Electronic Health Record Service Program***

34.      By mid-2004, Xtomic had created and developed E-commerce and web-based solutions for many clients in the healthcare industry including, but not limited to, the ART Companies.

35.      Based on the experience and expertise that Xtomic and its owners had developed, Xtomic began to consider developing software to manage health records electronically as an alternative to the paper management of health records. In June 2004, Mr. Ferguson attended a world-wide developer's conference in San Francisco where he met a number software developers and discussed the idea of electronic health records.

36.      Thereafter, Xtomic considered how electronic health records could be used in other areas of health care and, in particular, by some of its current clients, which at that time included several chiropractors.

37.      Over the next several years, Xtomic invested an enormous amount of its own time and resources to conceptualize and develop software for efficiently managing electronic health records ("EHR"), which software it calls its "EHR Service Application". These internal development costs, which exceeded $1.6 million, were never invoiced by Xtomic to any customer. Xtomic created, conceptualized, wrote and developed its EHR Service Application for its own business purposes, and not at the request of the ART Companies or any other customer.

38.      By May 2009, Xtomic had completed a detailed layout of its EHR Service Application.

39.     On May 14, 2009, Xtomic registered the web domain name "chiroapp.com" to use as its web platform for its EHR Service Application.

40.     During the latter part of 2009, Xtomic determined that its EHR Service Application could be utilized by other medical disciplines, not just chiropractors.  For that reason, Xtomic made an internal company decision to change the name of the web platform for its EHR Service Application from "chiroapp.com" to "mypracticesite.com."  On December 8, 2009, Xtomic registered the web domain name "mypracticesite.com."

41.     In December 2010, Xtomic began Beta testing its EHR Service Application on its "mypracticesite.com" platform.  Xtomic located and arranged for these BETA testers on its own without input or involvement from Dr. Leahy or the ART Companies.

42.     Xtomic created the entire EHR Service Application and authored all of its source code.

43.     Xtomic has never assigned its copyrights in the EHR Service Application to anyone.

44.     Pursuant to the Copyright Act, Xtomic owns, and has owned since its creation, the copyright in the EHR Service Application.

45.     On October 17, 2013, Xtomic registered its copyright in the EHR Service Application, Registration Nos. TX0007800437; TX0007800437.

46.     Neither Dr. Leahy nor any of the ART Companies objected to Xtomic registering its ownership of the copyright in the EHR Service Application.

***Xtomic's Agrees to Create an ART-Branded Version of its EHR Service Application***

47.     By mid to late 2009, Dr. Leahy was generally aware of Xtomic's EHR Service Application and inquired whether Xtomic could create an ART-branded version of Xtomic's EHR Service Application for the ART Companies to sell to its providers which would include a specific tab for a list of ART protocols.

48.     In the software business, the branding of software is called "branding" or "skinning" software and is a common practice in the industry.  The cost to "brand" or "skin" software products is typically a fraction of the total development cost of the software.

49.     After many discussions, Xtomic verbally agreed that, in exchange for payment of $60,000, it would (a) create and develop an ART-branded version of its EHR Service Application with certain ART protocols, and (b) give ARTBS LLC 50% of the sale proceeds from any sales of said version (the "Branding Agreement").

50.     Dr. Leahy coined the ART-branded version of Xtomic's EHR Service Application the ART Practice Management Software ("PMS Program").

51.     Upon information and belief, Dr. Leahy used ARTBS LLC to market the PMS Program to ART Practitioners.

52.     The Branding Agreement was not reduced to writing.

53.     At no time did the parties discuss or agree that Xtomic would sell or transfer its ownership rights in its EHR Service Application or the PMS Program to Dr. Leahy or to any of the ART Companies.

54.     Xtomic created the entire PMS Program and authored all of its source code.

55.     Xtomic and ARTBS LLC never executed a written contract for the creation of the

PMS Program.

56.    Xtomic and ARTBS LLC never signed any service agreement, business agreement, confidentiality agreement, non-compete agreement, non-solicitation agreement or any similar agreement related to the PMS Program.

57.    Xtomic has never assigned its copyrights in the PMS Program to anyone including, without limitation, Dr. Leahy or any of the ART Companies.

58.    Pursuant to the Copyright Act, Xtomic owns, and has owned since its creation, the copyright in the PMS Program.

59.    Xtomic, which had developed its EHR Service Application on its own at a development cost exceeding $1.6 million, would never have agreed to transfer ownership of Xtomic's lifeblood product in exchange for a payment of $60,000.

60.    Xtomic sold monthly subscriptions to the PMS Program to multiple ART Practitioners.


***The ART Companies' State Lawsuit against Xtomic***


61.    By mid-2013, the relationship between Xtomic and the ART Companies had become severely strained.

62.    Prior to that time, Xtomic hosted on its secure servers all of the Xtomic programs being utilized by the ART Companies (*i.e.*, the Admin Program and the EPN Program). Xtomic's EHR Service Application and PMS Program were also hosted on Xtomic's secure server.

63.    At no time prior to mid-2013 had the ART Companies or Dr. Leahy ever seen or

had access to the source code to any of Xtomic's programs including, without limitation, the Admin Program, the EPN Program, the EHR Service Application and the PMS Program.

64.     On or about August 6, 2013, the ART Companies sent a demand letter to Xtomic demanding, *inter alia*, that Xtomic provide the ART Companies all copies of the source code for the PMS Program and relinquish control of certain domain names.

65.     On August 21, 2013, the ART Companies filed suit against Tulio Pena (a former employee of the ART Companies), Xtomic, Mr. Ferguson, Select Seminar Services, LLC (a client of Xtomic and partially owned by Xtomic), and MSD Defense, LLC (also a client of Xtomic) in the District Court for El Paso County, Colorado, Case No. 2013cv030988 (the "State Lawsuit").  Copies of the ART Companies' Complaint and First Amended Complaint in the State Lawsuit are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

66.     The bulk of the ART Companies' allegations and claims in the State Lawsuit center on the allegation that the source code authored by Xtomic for the Admin Program, EPN Program, and PMS Program constitute "trade secrets" of the ART Companies.

67.     In its answer to the Art Companies Complaint and First Amended Complaint in the State Court, Xtomic raised defenses, *inter alia*, based upon its ownership to the copyrights of the Admin Program, EPN Program, EHR Service Application, and the PMS Program. Xtomic also counterclaimed against the ART Companies for a declaratory judgment stating that Xtomic owned the copyright to said programs.

68.     On August 22, 2013, the ART Companies moved the court in the State Lawsuit (the "State Court") for a temporary restraining order requiring Xtomic to, *inter alia*, (a) turn over to the ART Companies the source code to the Admin Program, the EPN Program, and the PMS Program, and (b) cease and desist from using the Admin Program, the EPN Program, and the

PMS Program.  The ART Companies also moved the State Court for a subsequent Preliminary Injunction hearing to continue the restrictions requested in their requested temporary restraining order.

69.     As a result of a series of hearings held by the State Court concerning the ART Companies' motion for a temporary restraining order and preliminary injunction with the State Court, the State Court ordered Xtomic to, *inter alia*, give control and use of Xtomic's Admin Program, EPN Program, EHR Service Application and PMS Program (collectively, the "Programs") to the ART Companies and has enjoined Xtomic from marketing, using or selling them.

70.     Consequently, the ART Companies now control the all of the Programs. Additionally, upon information and belief, the ART Companies are selling the PMS Program to at least two ART Practitioners on a periodic subscription basis.

71.     On October 14, 2013, the ART Companies moved the State Court to dismiss Xtomic's defenses and counterclaim based on Xtomic's claims of ownership of the copyright (the "Motion to Dismiss").

72.     On June 18, 2014, the State Court granted the ART Companies Motion to Dismiss.

**The ART Companies' have used the State Court to deprive Xtomic of its Copyrights**

73.     Under Colorado's Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq*., in order for something to be a trade secret, "the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access

thereto for limited purposes."

74.      Thus, the hallmark of a trade secret is secrecy and is dependent upon the owner's ability to keep it a secret from "persons other than those selected by the owner to have access hereto for limited purposes."

75.      Under the Copyright Act, the owner of a copyright has exclusive rights to reproduce and sell the copyrighted work to others. 17 U.S.C. § 106.

76.      Accordingly, the copyrighted work of one party cannot constitute a trade secret of another party under Colorado law as the owner of the copyrighted work has the right to give or sell the copyrighted work to third parties.

77.      Nevertheless, the ART Companies have utilized the State Court Lawsuit proceedings to improperly deprive Xtomic of its ownership to the copyright in the Programs under the guise that the Programs constitute "trade secrets" of the ART Companies

78.      As a result, Xtomic has been forced to, *inter alia*, turn over its copyrighted source code for each of the Programs to the ART Companies, and has been enjoined from exercising its right to reproduce or sell its copyrighted works to others.

79.      At no time prior to the dispute arising between Xtomic and the ART Companies did anyone other than Xtomic ever view or otherwise have access to the source code for any of the Programs.

80.      Upon information and belief, the ART Companies' actions to improperly deprive Xtomic of its ownership to the copyright in the Programs have been deliberate and calculated.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

81.      Xtomic hereby repeats, realleges and incorporates by reference each of the

12

preceding allegations of this Complaint set forth above, as if fully set forth herein.

82.     Xtomic conceptualized, created and developed each of the Programs.

83.     Xtomic owns the Programs as well as the copyright to the Programs.

84.     The ART Companies have directly and indirectly claimed ownership of the Programs, as well as ownership to the copyright to the Programs.

85.     The Copyright Act requires a written agreement to transfer ownership of a copyright.

86.     There is no written agreement between Xtomic and anyone (including, without limitation, the ART Companies) to transfer ownership of the copyright to Programs.

87.     The Programs are not, as a matter of law, works made for hire under the Copyright Act because Xtomic was not an employee of the ART Companies and because there is no written agreement that the Programs were works made for hire as those terms are used in the Copyright Act.

88.     Xtomic seeks an interpretation of its rights to the Programs under the Federal Copyright Act.

89.     There is an actual controversy about ownership of the Programs and ownership of the copyright to the Programs.

90.     A declaratory judgment by this Court will settle and determine the dispute over ownership of and copyrights to the Programs.

91.     Xtomic seeks declaratory relief pursuant to 28 U.S.C. § 2201 and F.R.C.P. Rule 57 that Xtomic is the owner of the Programs and owns the copyright to the Programs.

92.     Xtomic further requests a speedy hearing on its request for declaratory judgment. WHEREFORE, Xtomic prays for the relief as stated below.

## SECOND CLAIM FOR RELIEF
### (Copyright Infringement)

93.     Xtomic repeats, realleges and incorporates by reference each of the preceding allegations set forth above, as if fully set forth herein.

94.     The Programs contain a substantial amount of original material (including without limitation code, specifications, documentations and other materials) that is copyrightable subject matter under the Copyright Act.

95.     Without Xtomic's consent, authorization, approval, or license, the ART Companies have knowingly, willingly and unlawfully obtained copies of the Programs through the State Lawsuit.

96.     Without Xtomic's consent, authorization, approval, or license, the ART Companies have used the State Lawsuit to deprive Xtomic from exercising its copyrights in the Programs.

97.     Without Xtomic's consent, authorization, approval, or license, one or more of the ART Companies has and is selling the PMS Program to at least two ART Practitioners on a periodic subscription basis.

98.     By and through the above-described actions and events, the ART Companies have infringed and continue to infringe on Xtomic's copyrights to all or some of the Programs.

99.     Upon information and belief, the ART Companies' direct and induced infringements are and have been knowing and willful.

100.    By and through the above-described actions and events, the ART Companies have violated Xtomic's exclusive rights under 17 U.S.C. § 106.

101.    The ART Companies have realized unjust profits, gains and advantages as a proximate result of their infringement.

102.    The ART Companies will continue to realize unjust profits, gains and advantages as a proximate result of infringement as long as such infringement is permitted to continue.

103.    As a direct and proximate result of the ART Companies' copyright infringement, Xtomic has suffered, and will continue to suffer, monetary loss, including monetary loss to its business, reputation, and goodwill.

104.    Xtomic is entitled to recover from the ART Companies, in amounts to be determined at trial, the damages Xtomic has sustained and will sustain, and any gains, profits and advantages obtained by the ART Companies as a result of the ART Companies' acts of infringement and the ART Companies' use and publication of the copied materials. WHEREFORE, Xtomic prays for the relief as stated below.

## PRAYER FOR RELIEF

WHEREFORE, Xtomic requests that judgment be entered in its favor and against the ART Companies as follows:

a.      Entry of judgment declaring Xtomic as the sole owner of the Programs;

b.      Entry of judgment declaring Xtomic as the sole owner of the copyright to the Programs;

c.      Entry of judgment holding the ART Companies liable for infringement of Xtomic's ownership in and to the copyright to the Programs;

d.      An order permanently enjoining the ART Companies, its officers, agents, servants, employees, attorneys and affiliated companies, their assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of infringement of the Programs;

     e.       An order that all copies of the Program made or used in violation of Xtomic's copyrights, and all means by which such copies may be reproduced, be impounded or destroyed or otherwise reasonably disposed of;

     f.       An order awarding Xtomic statutory damages and damages according to proof resulting from the ART Companies' infringement of Xtomic's ownership of the copyright to the Programs, together with pre-judgment and post-judgment interest;

     g.       An order awarding Xtomic its attorneys' fees and costs under 17 U.S.C. § 505; and

     h.       Any and all other legal and equitable relief as may be available under law and which the Court deems just and proper.

## JURY DEMAND

Xtomic demands a jury trial for all issues so triable.

DATED: October 24, 2014

                         Respectfully submitted,

                         HOWARD & JENSEN LLC

                         /s/ Erin M. Jensen
                         Erin M. Jensen (Colo. Bar No. 39449)
                         Eric S. Howard (Colo. Bar No. 36432)
                         30 E. Kiowa Street, Suite 104
                         Colorado Springs, CO 80903
                         Tel: 719-362-5560
                         Fax: 800-584-9002
                         E-mail:  ejensen@howardandjensen.com
                                         ehoward@howardandjensen.com

*Plaintiff's Address*
Xtomic, LLC
801 South Tejon Street                  *Attorneys for Plaintiff Xtomic, LLC.*
Colorado Springs, Colorado 80903