**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 14-cv-02901–RM–KMT

XTOMIC, LLC, a Colorado limited liability company,

      Plaintiff,

v.

ACTIVE RELEASE TECHNIQUES, LLC, a Colorado limited liability company,
ART CORPORATE SOLUTIONS, INC., a Colorado corporation, and
ART BUSINESS SOLUTIONS, LLC, a Colorado limited liability company,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

The parties' cross-motions for summary judgment ask the Court to determine two issues arising under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. First, Plaintiff's motion seeks a declaratory judgment that it owns the copyright in the code to four computer programs. Second, Defendants' motion asks the Court to find that Plaintiff, based on its conduct, granted an implied, unlimited, nonexclusive license to retain, use, and modify the software programs, which is a complete defense to Plaintiff's second cause of action for copyright infringement.

For the reasons discussed below, the Court GRANTS Plaintiff's motion for partial summary judgment. The Court DENIES Defendants' motion for summary judgment.

## I.    BACKGROUND

The following are the undisputed and material facts taken from the parties' statements of undisputed facts and accompanying exhibits.

## A.    Plaintiff and Defendants' Relationship

Plaintiff is a computer software and development company.    (ECF No. 118-1, Pl.'s Sep. Statement of Undisputed Mat. Facts ("Pl.'s SUMF"), Pl.'s SUMF ¶ 2.)    Plaintiff creates, develops, and maintains a variety of computer software, software applications, data management applications, and practice management applications.    (*Id.*)    Defendants[1] provide healthcare services directly to patients and through a network of providers who have been trained in Defendants' "soft-tissue manipulation techniques."    (ECF No. 121-1, Defs.' Sep. Statement of Undisputed Mat. Facts ("Defs.' SUMF"), Defs.' SUMF ¶¶ 1, 2.)

The parties' businesses overlapped as Plaintiff provided software development and other IT services to Defendants from 2002 to 2013.    (*Id.*, Defs.' SUMF ¶ 5.)    Defendants terminated the business relationship with Plaintiff in 2013—which is also when the parties' conflicting copyright ownership claims over the programs began.    (*Id.*, Defs.' SUMF ¶ 25.)    The disputes revolve around four programs referred to by the parties as follows: the (1) Admin Program; (2) EPN Program; (3) EHR Service Application; and (4) PMS Program.    (*Id.*, Defs.' SUMF ¶ 6.) There are no written agreements between Plaintiff and Defendants regarding any of the programs. (*Id.*, Defs.' SUMF ¶ 24.)

Although Defendants refer to the programs "collectively," the factual assertions surrounding the Admin and EPN Programs are very different than those surrounding the EHR and PMS Programs.    As such, the Court will discuss the Admin and EPN Programs together and the EHR and PMS Programs together.

---

1   The three named defendants appear to provide different services and serve different functions related to the healthcare and business operations of Active Release Techniques.    The Court collectively refers to all three entities as "the Defendants."    However, as discussed below, the fact that there are three separate legal entities is material to the "implied license" defense at issue.

### B.    The Programs

#### 1.    The Admin Program and EPN Program

The parties do not dispute that the Admin Program and EPN Program were developed at Defendants' request to assist in managing its data.    (ECF No. 121-1, Defs.' SUMF ¶¶ 8, 11.) Plaintiff provided both programs on a monthly basis for which it charged in arrears.    (*Id.*, Defs.' SUMF ¶¶ 10, 13.)    Plaintiff adds that it only invoiced Active Release Techniques, LLC for use of the Admin Program whereas it only invoiced ART Corporate Solutions, Inc. for use of the EPN Program.    (*Id.*, Defs.' SUMF, AF[2] ¶¶ 10, 13.)

The parties also do not dispute that the Admin Program and EPN Program were hosted on servers owned by Plaintiff.    (*Id.*, Defs.' SUMF ¶ 20.)    It is uncontested that, throughout the parties' business relationship, Defendants' employees and providers could access and use both programs.    (*Id.*, Defs.' SUMF ¶ 19.)    But Plaintiff asserts that Defendants did not have access to the source code[3] for the Admin Program or EPN Program; did not have the ability to modify the programs; and the programs were never installed on a computer or server owned or controlled by Defendants.    (*Id.*, Defs.' SUMF, AF ¶ 19.)    Similarly, Plaintiff contends that only its employees had access to its servers.    (*Id.*, Defs.' SUMF, AF ¶ 20.)    Plaintiff claims that it, and it alone, made the conscious decision to limit Defendants' electronic access to the programs and Defendants' physical access to its servers.    (*Id.*)

Defendants reply that Plaintiff provided the source code for the Admin Program and EPN

---

2    "AF" refers to Plaintiff's additional facts included in Defendants' Separate Statement of Undisputed Material Facts.

3    When programmers write code, they write in "source code," which is written in a programming language that humans can understand.    This source code is then compiled into object code which is essentially a translation of source code into something the computer can understand and execute.    Generally, when software is distributed, only the compiled object code is distributed and the programmer retains the source code.    Regardless of whether the computer program is in object code or source code form, it is copyrightable and protectable.    *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 n.5 (9th Cir. 2008) (quotations and citations omitted).

Program in 2008 and again in 2013. (*Id.*, Defs.' SUMF, Reply to AF ¶ 19.)[4] Furthermore, Defendants assert that the Plaintiff provided them the source code and placed no restrictions on their access to, or use of, the source code. (*Id.*) With regard to hosting the programs on Plaintiff's servers, Defendants state that it was a decision the parties mutually agreed upon. (*Id.*, Defs.' SUMF, Reply to AF ¶ 20.) Then, Defendants note that Plaintiff helped transition the source code to a new vendor and did not "put any limits on that[,]" in 2008. (*Id.*) Although it is unclear from the parties' filings, it appears that the preceding factual contentions are limited to the state of affairs before May of 2013.

In May 2013, Defendants terminated the business relationship with Plaintiff. (*Id.*, Defs.' SUMF ¶ 25.) According to Defendants, it was at that time Plaintiff voluntarily turned over the source code and related files for the Admin Program and EPN Program for a second time. (*Id.*, Defs.' SUMF ¶ 26.) Defendants cite testimony from one of Plaintiff's principals to further claim that the source code was turned over without any restrictions on Defendants' access to, or use of, it. (*Id.*, Defs.' SUMF, Reply to AF ¶ 26.)

According to Plaintiff, Defendants requested the source code to the Admin Program and EPN Program to run the programs on Defendants' servers so that Plaintiff would not have access to Defendants' data. (*Id.*, Defs.' SUMF, AF ¶ 26.) Plaintiff admits that it provided Defendants the source code to the Admin Program and EPN Program. (ECF No. 113-3, Resps. to RFA Nos. 9 ant 11 at 25-26.) But Plaintiff contends that after being "harassed" by third-party vendors, it "finally acquiesced to [Defendants' demands] with the promise from [Plaintiff] that [Plaintiff],

---

4  Plaintiff includes "Additional Relevant Facts," which are numbered consecutively, but do not correspond to Defendants' numbered facts. For example, Plaintiff provides "Additional Relevant Fact No. 5" in response to Defendants' Undisputed Material Fact No. 19. For consistency, clarity, and ease of reference, the Court cites to the number of the Defendants' Undisputed Material Fact in the far left column and uses that same number when referring to Plaintiff's additional facts (in the middle column) or Defendants' Reply to those additional facts (in the far right column).

within a few months, cease using the Admin Program and the EPN Program." (ECF No. 121-1, Defs.' SUMF, AF ¶ 26.) And Plaintiff states that it did not give permission to modify or create derivative works with respect to the Admin Program and EPN Program. (*Id.*) Despite Defendants' promise, Plaintiff asserts that Defendants continue to use the programs to this day. (*Id.*)

Finally, Defendants state that they paid Plaintiff approximately $2 million between 2002 and 2013. (*Id.*, Defs.' SUMF, ¶ 23.) Plaintiff responds that Defendants only paid $1,747,531.09 over that time period, of which "less than 30%" was for use of the Admin Program and EPN Program. (*Id.*, Defs.' SUMF, AF ¶ 23.)

### 2. The EHR Service Application and PMS Program

According to Plaintiff, it created and developed the EHR Service Application, without any input or assistance from Defendants, to be marketed to the healthcare industry for record management—it was not developed for or at the request of Defendants. (*Id.*, Defs.' SUMF, AF ¶ 6.) Plaintiff maintains that the PMS Program is merely a version of its EHR Service Application that has been branded for use by the Defendants' providers, not by Defendants. (*Id.*) Plaintiff insists that the branded version was created for Defendants pursuant to the following verbal agreement: (a) an initial payment of $60,000 from Defendants; and (b) Plaintiff would give ART Business Solutions, LLC 50% of any sales proceeds from the branded version. (*Id.*; Defs.' SUMF, AF ¶ 33.) Defendants, relying on allegations in Plaintiff's Complaint, contend that Plaintiff agreed to create and develop the PMS Program at Defendants' behest. (ECF No. 121-1, Defs.' SUMF, ¶ 6 and Reply to AF ¶ 6.)

After the PMS Program had been developed, the parties agree that Plaintiff did **not** voluntarily provide the source code and related files to Defendants. (ECF No. 121-1, Defs.'

SUMF, ¶ 28.)   Plaintiff only provided the source code after being ordered to do so by a preliminary injunction that Defendants obtained in state court.   (*Id.*)   The parties further agree that the state court vacated its preliminary injunction after Plaintiff (as the defendant in the state court action) prevailed at trial on all thirty-two (32) causes of action asserted against it.   (*Id.*)

Next, Defendants direct the Court's attention to a copyright notice contained in the PMS Program's source code and several invoices from Plaintiff.   (*Id.*, Defs.' SUMF, ¶¶ 17, 18.)   With regard to invoices sent by Plaintiff, Defendants point to the following statement at the bottom of the documents: "All source code and Images created by [Plaintiff] and used by the client become the client's property when Invoice is paid in full."   (*Id.*, Defs.' SUMF, ¶ 18.)   Plaintiff counters that the copyright notice contained in the source code was intended to cover Defendants' logo. (*Id.*, Defs.' SUMF, AF ¶ 17.)   Plaintiff asserts that the invoices were not related to the programs at issue and that, in any event, various invoices were never paid.   (*Id.*, Defs.' SUMF, AF ¶ 18.)

## C.   This Lawsuit

Plaintiff's Complaint alleges two causes of action related to the programs.   First, Plaintiff seeks a declaratory judgment that it owns the copyright in the Admin Program, EPN Program, EHR Service Application, and PMS Program.   (ECF No. 60, Compl. ¶¶ 74, 103-114.)   Second, Plaintiff alleges that Defendants are liable for copyright infringement as to each of the programs. (*Id.* at ¶¶ 115-126.)   Plaintiff moves the Court for partial summary judgment and a declaration that it owns the copyright in the Admin Program, EPN Program, EHR Service Application, and PMS Program.   (*See* ECF No. 110.)   Defendants concede Plaintiff's motion to the extent of the claims of copyright ownership.   (ECF No. 116 at 3.)

Defendants seek summary judgment that Plaintiff granted an implied license to use the programs.   (ECF No. 113.)   An implied license serves as a complete defense to Plaintiff's

copyright infringement claims. (*Id.*) Additionally, Defendants request a declaration from the Court that Plaintiff has granted an unlimited, nonexclusive license to retain, use, and modify each of the programs for its own purposes. (*Id.* at 12.) Plaintiff responds that material issues of fact preclude summary judgment on the implied license issue. (ECF No. 117.)

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569–70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).

The Court will consider statements of fact, or rebuttals thereto, which are material and supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). Summary judgment evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010). Affidavits must be based on personal knowledge and must set forth facts that would be admissible at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995)

(quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id.* "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotations and citation omitted). The Court is "not obligated to comb the record in order to make [a party's arguments]." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

"Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (citations and quotations omitted). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Id.* (*quoting Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). The Court now addresses each motion in turn.

## III.    ANALYSIS

### A.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment to establish copyright ownership in the Admin Program, EPN Program, EHR Service Application, and PMS Program. (*See* ECF No. 110.) Although Defendants initially sought copyright ownership rights in the Programs, it now confesses Plaintiff's claim of copyright ownership. (*Compare* ECF No. 77 at ¶ 20 *with* ECF No. 116 at 3.) Notwithstanding the Defendants' confession of the motion, the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotations omitted); *see also* Fed. R. Civ. P. 56(c) and (e). Thus, the Court analyzes Plaintiff's motion and supporting evidence to determine whether this burden has been met.

Computer software is subject to copyright protection. *See* 17 U.S.C. § 101. "The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991); 17 U.S.C. § 201(a) ("Copyright in a work protected under this title vests initially in the author or authors of the work."). But "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). Section 101 of the Copyright Act defines the term "work made for hire." Based on the language and structure of section 101, the Supreme Court explained "that a work for hire can arise through one of two mutually exclusive means, one for employees and one for independent contractors[.]" *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989). To analyze a work for hire claim, "a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101." *Id.* at 751. If the work was prepared by an employee within the scope of his or her employment, then the employer owns the copyright. 17 U.S.C. § 101. If the work was prepared by an independent contractor, "the parties [must] expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *Id.*

Here, Plaintiff presents evidence, which Defendants' do not dispute, to establish that Mr. Varney, as an employee of Plaintiff created and authored all of the source code for the Admin

Program, EPN Program, EHR Service Application, and PMS Program. (ECF No. 118-1, Pl.'s SUMF ¶¶ 10, 19, 39, 50.) And both parties agree there is no written agreement between them related to the four programs. (*Id.*, Pl.'s SUMF ¶¶ 12, 20, 52; ECF No. 121-1, Def.'s SUMF ¶ 24.) Therefore, the Court concludes that pursuant to 17 U.S.C. § 201(b), Xtomic, LLC is the author and owns all of the copyright rights in the Admin Program, EPN Program, EHR Service Application, and PMS Program.

### B.    Defendants' Motion for Summary Judgment

Section 204(a) of the Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Section 101 of the Act defines "transfer of copyright ownership" to include exclusive licenses, but expressly excludes nonexclusive licenses. *See id.* § 101; *Effects Assoc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). Thus, even though section 204(a) invalidates any transfer of copyright ownership not in writing, section 101 explicitly removes a nonexclusive license from the section 204(a) writing requirement. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996).

Although the Tenth Circuit has not addressed the issue of implied licenses in copyright, the preeminent treatise on copyright, and other circuits, agree that a "nonexclusive license may be granted orally, or may even be implied from conduct." *Id.*; 3 Nimmer on Copyright § 10.03[A] (2018); *see also Effects*, 908 F.2d at 558. And the existence of an implied license creates an affirmative defense to a claim of copyright infringement. *Shaver*, 74 F.3d at 775; *Effects*, 908 F.2d at 559. Where a nonexclusive license exists, the creator or licensor of the work does not transfer ownership of the copyright to the licensee, but "simply permits the use of a copyrighted work in a

particular manner." *Shaver*, 74 F.3d at 775. To determine whether an implied license exists, courts apply what has come to be known as the *Effects* test. An implied license will arise where "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Shaver*, 74 F.3d at 776 (citing *Effects*, 908 F.2d at 558-59). "The relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' **conduct**." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (emphasis added). Because the existence of an implied license is an affirmative defense to infringement, the alleged infringers have the burden of establishing an implied license. *Shaver*, 74 F.3d at 775. The Ninth Circuit has applied these principals to a dispute between a software developer and his client in *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 750 (9th Cir. 2008), which the Court finds instructive.

In *Gagnon*, the software developer, Gagnon, was hired as an independent contractor to develop custom software for AMS, a field marketing company. *Id.* at 750. Over the course of their four-year relationship, AMS paid Gagnon over $2 million—$250,000 of which was for six programs at issue in the parties' lawsuit. *Id.* AMS decided to terminate Gagnon's services. *Id.* at 751. In response, Gagnon demanded that AMS remove all of his source code from the AMS computers, which had been installed on the AMS computers located at the AMS facilities. *Id.* at 752. AMS refused, contending that "Gagnon could not unilaterally stop AMS from continuing to use and update the programs because it had an irrevocable license to use, copy, and modify the programs based on the course of conduct of the parties over the past two-and-a-half years." *Id.* Ultimately, the Ninth Circuit agreed with AMS and, in applying the *Effects* test, held that:

> Gagnon had to express an intent to retain control over the programs and limit AMS's

11

license if he intended to do so.   A belated statement that the programs could not be used after Gagnon's departure, made after the termination decision and well after the creation and delivery of the programs for which substantial sums were paid, was not sufficient to negate all other objective manifestations of intent to grant AMS an unlimited license.

*Id.* at 757.   With these guiding principles in mind, the Court first discusses how they apply to the Admin Program and EPN Program and then to the EHR Service Application and PMS Program.

### 1.   *The Admin Program and EPN Program*

#### a.   <u>Request</u>

The parties do not dispute that the Admin Program and EPN Program were developed at Defendants' request to assist in managing its data.[5]   (ECF No. 121-1, Defs.' SUMF ¶¶ 8, 11.)   No genuine issue of material fact remains as to whether Defendants' requested the Admin Program or EPN Program.   Therefore, this factor weighs in favor of finding an implied license to use the programs.

#### b.   <u>Delivery</u>

Defendants argue that Plaintiff delivered the Admin Program and EPN Program in two ways.   First, Plaintiff provided electronic access to the programs even though the programs were hosted on Plaintiff's servers.   (ECF No. 113 at 11.)   Second, in 2013, Plaintiff provided Defendants with the source code and related files for use of the Admin and EPN Programs.   (*Id.*) Plaintiff says, "not so fast."   First, Defendants did not specifically pay for hosting the programs on Plaintiff's servers—plus, the hosting decision was made by Plaintiff so it could control Defendants' electronic access to the programs.   (ECF No. 117 at 8.)   Second, the source code was only turned over after Defendants', and their vendors, demanded the source code and harassed Plaintiff.   (*Id.* at

---

5   More specifically, the Admin Program was developed at the request of Active Release Techniques, LLC (ECF No. 113-3 at 17) whereas the EPN Program was developed at the request of ART Corporate Solutions, Inc. (*Id.* at 18.) Both requests were made to assist with data management.   (*Id.* at 17-18.)

8.)   Moreover, the source code was turned over with Defendants' promise that it would only be used for "a few months."   (*Id.*)   The Court finds that Plaintiff created the software for Defendants and delivered the two programs.

Here, the objective facts are that Plaintiff gave access to use the programs and even transferred the source code for the Admin and EPN Program.   *Gagnon*, 542 F.3d at 757 (emphasis added) ("Even if [software developer] and his employees maintained the software and had primary control over the code, they programmed on-site at [client's site and on client's] computers to which key **[client] personnel had access**-conduct that does not demonstrate an intent to retain sole control."); *see also Holtzbrinck Pub. Holdings, L.P. v. Vyne Commc'ns, Inc.*, No. 97 CIV. 1082 (KTD), 2000 WL 502860, at *5 (S.D.N.Y. Apr. 26, 2000) (finding work product delivered when site launched and defendant given access to use the site).   Plaintiff's arguments and purported factual disputes go to its subjective intent, its reluctance to deliver the source code, and the scope of the license.   But Plaintiff's objective conduct unmistakably indicates that the Admin Program and EPN Program were created and delivered so that Defendants could use them.   Accordingly, these two programs were delivered.

c.   Intent as Manifested by Plaintiff's Conduct

The heart of the dispute centers on intent.   Defendants argue that the creation and delivery of the source code for the Admin Program and EPN Program, without any express restrictions or limitations of use, manifested an objective intent to grant Defendants an implied license to use the programs.   (ECF No. 113 at 12.)   Plaintiff sets forth three contentions to support its argument that there are material factual issues regarding intent, and the scope of any license, that preclude summary judgment on Defendants' implied license defense.   (ECF No. 117 at 10-13.)   First, Defendants did not pay for perpetual use and access to the Admin Program and EPN Program.   (*Id.*

13

at 10.)   Second, Plaintiff retained the source code on its servers so it could limit Defendants' use of the programs in the event Defendants failed to pay the monthly access fee.   (*Id.*)   Finally, even though Plaintiff gave Defendants the source code, it was done "with the express, verbal limitation that [Defendants] would only use those programs for a few months."[6]   (*Id.*)

The First, Fourth, and Ninth Circuits consider the following factors to determine intent: (1) whether the parties were engaged in a short-term discrete transaction versus an ongoing relationship; (2) whether the creator utilized written contracts providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.   *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002); *Gagnon*, 542 F.3d at 756.   The Court finds these factors helpful in guiding the intent analysis.

Here, in 2013, it is undisputed that the parties' business relationship was strained. Defendants demanded the Admin Program and EPN Program so that Plaintiff did not have access to its data.   Then, Defendants ultimately terminated the business relationship.   Against this backdrop, Plaintiff gave Defendants the *source code* to the Admin Program and EPN Program. The fact that Plaintiff voluntarily transferred the source code directly undermines its arguments that

---

6   As support for this purported factual dispute, Plaintiff cites to the declarations of its owners Keith Varney and Jay Ferguson.   (*See* ECF Nos. 117-2 and 117-3.)   Both declarations provide the following: "All of the statements in the second column of Xtomic's Separate Statement of Undisputed Material Facts in Opposition to ART's Second Amended Motion for Summary Judgment are true."   The Court rejects this aberrant practice of suffusing truth over all statements of fact contained in a pleading filed with this Court.   More importantly, Plaintiff fails to identify who made this statement, to whom the statement was made, or when the statement was made.   Thus, neither the content nor the substance of such a declaration is "evidence" that would be admissible at trial.   *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010).   Finally, Plaintiff cites to its interrogatory responses as support for this contention. (ECF No. 113-3 at 26-27.)   But the interrogatory response states something very different; it states that "*ART* further indicated that it only intended to use the Admin Program [and EPN Program] for a short period of time[.]"   (*Id.*) This also fails to support Plaintiff's factual dispute.

14

it sought to restrict or control access to the two programs. By voluntarily transferring the source code, Plaintiff relinquished its ability to control access to, use of, or modification of the programs. Plaintiff obviously knew this because, as discussed below, it refused to provide the source code to the EHR Service Application and PMS Program until a court ordered it to do so.

Although Plaintiff argues that Defendants did not pay for perpetual use and access to the programs, Plaintiff admits that it has been paid "less than 30%" of $1,747,531.09 for Defendants' use of the Admin Program and EPN Program. Plaintiff fails to specify how much less than 30% was paid. But, if 25% was paid for use of the Admin Program and EPN Program, that amounts to $436,882, which is a substantial sum. Moreover, there is no writing to suggest that the programs could only be used with Plaintiff's future involvement or express permission. Like the special effects creator in *Effects* and the software developer in *Gagnon*, Plaintiff "was well paid for [its] services. Under the circumstances, it defies logic that [Defendants] would have paid [Plaintiff] for [its] programming services if [Defendants] could not have used the programs without further payment pursuant to a separate licensing arrangement that was never mentioned[.]" *Gagnon*, 542 F.3d at 756-57.

But the Court must stop short of granting summary judgment in favor of "the Defendants." Because Defendants frequently refer to themselves collectively, the foregoing contains an assumption that the analysis applies equally to each defendant. In other words, the nature of the evidentiary presentation asks the Court to conclude each corporate entity requested each program, received delivery of that program, and that Plaintiff's conduct was directed at, and the same, with respect to each of the three separate legal entities. However, summary judgment must not be premised on assumptions—in this instance, the moving party must present competent evidence to establish a complete defense to the claims of copyright infringement. This Defendants,

individually, have failed to do.   Apart from identifying the specific legal entity that requested the

Admin Program and EPN Program, all that has been presented is general evidence that the

programs were "provided to Defendants" (ECF No. 121, Defs.' SUMF ¶¶ 10, 13), and that

"Defendants paid" $2 million to Plaintiff (*Id.*, Defs.' SUMF ¶ 23).   Based on this record, the Court

cannot decipher on summary judgment, and as a matter of law, to which (perhaps none, one, or

more) of the three named defendants Plaintiff has granted the implied license.   The named

defendants are separate legal entities, despite Defendants' argument that they are commonly owned

by the same individual.   (ECF No. 121 at 8.)   Accordingly, summary judgment must be denied on

the present record.

### 2.     *The EHR Service Application and PMS Program*

#### a.     Request

Defendants argue that Plaintiff developed the PMS Program at its request.   (ECF No. 113

at 10.)   Plaintiff responds that the PMS Program was not created at Defendants' request.   (ECF

No. 117 at 5-6.)   According to Plaintiff, it developed the EHR Service Application entirely on its

own and without any input or assistance from Defendants—with internal development costs of

approximately $1.6 million, which was never invoiced to any customer.   (*Id.* at 5; *see also* ECF

No. 118-1, Pl.'s SUMF ¶¶ 26-41.)   Further, Plaintiff maintains that the PMS Program is merely a

"skinned" or "branded" version of the EHR Service Application.   (ECF No. 117 at 5.)   Neither

party disputes that branding or skinning a software product only costs a fraction of the total cost to

develop the software.   (ECF No. 118-1, Pl.'s SUMF ¶ 45.)

The real issue is whether the branded PMS Program is sufficiently distinct from the EHR

Service Application for it to be considered a separate program developed at Plaintiff's request.

Defendants argue that they only seek a license to use the PMS Program, thus any discussion of the

EHR Service Application is irrelevant. (ECF No. 121 at 2-3.) But Defendants' argument does not address the core dispute—Plaintiff essentially claims that the PMS Program *is* the EHR Service Application. And there is a material factual dispute as to this issue. Plaintiff presents evidence that it created the EHR application on its own initiative, at its own expense of $1.6 million, and then offered a branded version to Defendants. *Cf. Gagnon*, 542 F.3d at 755 ("Gagnon did not create the programs on his own initiative and market them to AMS; rather, he created them in response to AMS's requests."). Therefore, a genuine issue of material fact remains as to whether Defendants requested the PMS Program.

b.   <u>Delivery</u>

Black's Law Dictionary defines delivery as "[t]he formal act of voluntarily transferring something[.] Black's Law Dictionary (10th ed. 2014). In this case, the parties agree that Plaintiff did not voluntarily provide Defendants with the source code or related files. (ECF No. 121-1, Defs.' SUMF ¶ 28.) Plaintiff only provided the source code and related files after a state court entered a preliminary injunction, which is not a voluntary transfer. (*Id.*) Therefore, this factor weighs against finding an implied license for Plaintiff to use the PMS Program.

c.   <u>Intent as Manifested by Plaintiff's Conduct</u>

Apart from reiterating the points discussed above, the parties provide little additional argument as to the intent manifested by Plaintiff's conduct as it relates to the PMS Program. (*See* ECF No. 113 at 12; ECF No. 117 at 10; ECF No. 121 at 6-7.) Defendants raise three additional points in their reply brief: (1) in the PMS source code, Plaintiff included a copyright notice in favor of Defendants; (2) several invoices state that source code becomes the client's property upon payment of the invoice; and (3) Plaintiff refused to provide the source code and registered its copyright in the programs only after the parties ended their relationship. (ECF No. 121 at 6-7.)

The Court is not persuaded by Defendants' arguments.

First, Plaintiff stated in deposition testimony that the copyright notice was intended to cover Defendants' logo, not the source code. (ECF No. 121-1, Resp. to Defs.' SUMF ¶ 17.) Plaintiff also points to the fact that the copyright notice was not included in the EHR Service Application, which the Court interprets to mean that Plaintiff was not giving away its EHR source code, but only trying to protect the "branded" portions that had been added to the source code for Defendants.

Second, the Court has reviewed the invoices that Defendants rely on. None of the invoices refer to the EHR Service Application or the PMS Program. (ECF No. 121-1, Defs.' SUMF ¶ 18.) Nonetheless, Plaintiff claims that the invoices were never paid. (ECF No. 121-1, Resp. to Defs.' SUMF ¶ 18.)

Finally, the after-the-fact registration of the copyright notice does not negate Plaintiff's objective conduct: it refused to provide Defendants the source code to the PMS Program and only provided the code after being ordered to do so by a court. The Court also notes the substantially different amounts paid for the Admin and EPN Program ($436,882) as opposed to the PMS Program ($60,000 plus 50% of any sales proceeds). When considering the evidence that Plaintiff developed the EHR Service Application on its own initiative, paid for its own development costs, refused to provide Defendants the source code, and received a fraction of the overall development cost from Defendants, it cannot be said, on summary judgment, that Plaintiff intended to grant Defendants a nonexclusive license to use the EHR Service Application or PMS Program. Therefore, Defendants' motion is denied as to the EHR Service Application and PMS Program.

## C.    Defendants' Declaratory Judgment Request

Defendants ask the Court to enter summary judgment on their counterclaim for declaratory judgment that Defendants have "an unlimited, nonexclusive license to retain, use, and modify the

programs." (ECF No. 113 at 1-2; 12.) The quoted language in the preceding sentence represents the full extent of Defendants' legal analysis and authority. Since Defendants have not provided a fully developed analysis or legal authority to establish that it meets the elements of its counterclaim for declaratory judgment, the Court will not undertake this task for them. *See, e.g., Good v. Hamilton*, 141 F. App'x 742, 744 (10th Cir. 2005) (unpublished) (party's conclusory and undeveloped argument insufficient for court to consider); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived, . . . and bald assertions in briefs that there are genuine issues of material fact are insufficient to merit reversal of summary judgment"). Accordingly, summary judgment is denied as to Defendants' request for declaratory relief.

IV. **CONCLUSION**

Based on the foregoing, the Court:

(1)     GRANTS Plaintiff's motion for partial summary judgment (ECF No. 110);

(2)     DECLARES that Plaintiff Xtomic, LLC is the author of, and owns the copyright rights in, the Admin Program, EPN Program, EHR Service Application, and PMS Program;

(3)     DENIES Defendants' motion for summary judgment (ECF No. 113); and

(4)     DENIES Defendants' request for entry of declaratory judgment on its counterclaim (ECF No. 113).

DATED this 13th day of September, 2018.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

19