**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 14–cv–02901–RM–KMT

XTOMIC, LLC, a Colorado limited liability company,

    Plaintiff,

v.

ACTIVE RELEASE TECHNIQUES, LLC, a Colorado limited liability company,
ART CORPORATE SOLUTIONS, INC., a Colorado corporation, and
ART BUSINESS SOLUTIONS, LLC, a Colorado limited liability company,

    Defendants.

_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
_____

    This action arises from a dispute over copyrights in four software programs: the Admin Program, EPN Program, EHR Service Application, and PMS Program. Plaintiff filed this action alleging it created and developed all four programs and sought (1) a declaratory judgment that it is the owner of the programs and owns the copyrights to the programs; and (2) relief based on Defendants' alleged copyright infringement of the programs. Defendants counterclaimed for declaratory judgment that Plaintiff granted Defendants a license to the programs, to the extent Defendants did not own the copyrights.

    Upon the joint request of the parties, the Court bifurcated this case into two phases. Phase I would address the parties' competing declaratory judgment claims. Phase II would address Plaintiff's infringement claim.

As part of Phase I, the Court granted summary judgment in favor of Plaintiff, declaring that it is the author of, and the owner of the copyrights in, all four programs. Since then, Defendants have conceded they do not have implied licenses to the PMS Program or EHR Service Application. Thus, the only issues for trial in Phase I are which Defendants, if any, have implied licenses to the Admin Program or EPN Program.

From February 19-20, 2020, the Court held a bench trial on the implied license issues which remain. During the trial, Defendants conceded that Defendant Art Business Solutions, LLC was not granted an implied license in either of the programs at issue. After examining the evidence, considering any concessions of the parties, evaluating the credibility of the witnesses, and analyzing the law, and being otherwise fully advised, the Court finds, concludes, and orders as follows.

## I.    FINDINGS OF FACT[1]

1.    Plaintiff Xtomic, LLC is a computer software and development company whose owners and employees are Keith Varney and Jay Ferguson.

2.    Dr. Michael Leahy is the CEO of Defendant Active Release Techniques, LLC ("ART LLC") and ART Corporate Solutions, Inc. ("ART Corporate"). He has a doctorate in chiropractic from the Los Angeles College of Chiropractic. Over time, Dr. Leahy developed a form of therapy called "active release techniques" or "ART." At some point in time, Dr. Leahy formed Defendants; he is the owner, in whole or in major part, of all Defendants.

3.    Defendant ART LLC, a Colorado limited liability company, is the seminars side of Dr. Leahy's ART business. This business provide seminars to certify providers of ART, i.e., ART providers, to patients.

---

[1] To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein by reference as findings of fact.

4. Defendant ART Corporate, a Colorado corporation, provides ART in the workplace. "Elite" ART providers, those who have received additional or advanced training in ART, work for ART Corporate on a contract basis servicing its corporate accounts and customers.

5. Defendant ART Business Solutions, LLC ("ART Business"), a Colorado limited liability company, is no longer functioning.

6. ART LLC and ART Corporate are collectively referred to herein as the "ART Defendants."

7. In approximately 2003 and 2004, Dr. Leahy requested Xtomic to develop software programs which became the Admin Program and the EPN Program (collectively, the "Programs").

8. The Admin Program was a web-based application and ART LLC's main website which manages its seminars business. The website allowed for, among other things, online registration for seminars. These seminars are used to train ART providers.

9. The EPN Program is a web-based application for elite providers; "EPN" stands for elite provider network. This program allows ART Corporate to manage the treatments provided to employees of corporate clients, the hours provided, and related billing. It also allows elite providers to access the work schedule and record treatment notes.

10. The Admin and EPN Programs were not static; ART Defendants sometimes had change requests or add-ons which Xtomic made to the Programs.

11. The parties did not have a written contract; they did not have any discussions about copyrights or licenses.[2] Instead, Xtomic sent invoices monthly for services rendered,

---

[2] Mr. Ferguson testified Dr. Leahy first brought up copyrights in about October 2012 regarding the EHR Service Application. The Court makes no findings regarding such testimony because that application is not at issue here.

which included not only the Programs and but also many other services such as layouts for manuals and video production.

12. In 2008, the parties parted ways for a short time. Dr. Leahy thought he could obtain the same services from the fiancé of one of his employees for a lot less money. When that didn't work out, the parties resumed their business relationship. Although the parties discussed having a written agreement, and a draft was made, no written agreement was entered into and any terms are unknown.

13. During this first breakup, ART Defendants asked for and received a backup of their databases for the Programs.

14. In about 2009,[3] while Xtomic continued to send invoices for services rendered, the manner in which it did so changed. Initially, Xtomic addressed the invoices to ART LLC but the invoices were apparently paid by separate checks by the ART Defendants. By about 2009, at ART Defendants' request, Xtomic started sending separate invoices to ART LLC and ART Corporate. Dr. Leahy did so to keep track of income and expenses for ART LLC and ART Corporate so they could get an idea about profit and loss. To Xtomic, it mattered not who paid for its services.

15. Over the years, ART Defendants paid Xtomic about $519,000 related to work on the EPN Program and almost $483,000 related to work on the Admin Program.

16. In about 2013, the parties parted ways again. This time permanently. And, when they did so, Xtomic gave ART Defendants everything, i.e., the source code and databases, they needed for the Programs.

17. However, at all relevant times, Xtomic's web application source code for the

---

[3] Also, at some point in time, the parties changed to an unwritten flat rate service agreement arrangement, but the Court finds that is not material to its decision.

Programs was located (hosted) at its servers at its colocation[4] in Colorado Springs, Colorado. Further, the source code was never located on servers at any of ART Defendants' locations, was never electronically accessible to ART Defendants, and was never physically accessible to ART Defendants because they never had physical access to the colocation or the servers that contained the source code. Thus, during the breakup, ART Defendants retained a third-party to assist with transferring what they needed from Xtomic.

18. Specifically, ART Defendants hired Tarang Deshpande's company Socon Media, Inc. and Christopher Lozing and his company Tech Farmer LLC to transfer everything related to the Programs to ART Defendants, to enable them to have and use the Programs. This included transfer of the source code, the databases, and the registration of the related domains. ART Defendants intended to use the Programs indefinitely and to modify the Programs to adapt to their needs. While Xtomic initially refused to provide the source code for the Programs, after several discussions with Mr. Deshpande, Xtomic did so. Xtomic hoped doing so would avoid future disputes between the parties, i.e., that ART Defendants would go away nicely.

19. During the transfer, Xtomic placed no limitations on how long the Programs could be used or whether they could be modified. Nor did Xtomic state that ART Defendants were required to make monthly payments as long as they used the Programs. Instead Xtomic sent six invoices.

20. Two of the invoices were dated May 29, 2013, two were dated June 27, 2013, and two were dated July 31, 2013. There were two invoices for each date because one was addressed to ART LLC and the other to ART Corporate. All six invoices contained the same language: "All source code and images created by Xtomic and used by the client become the client's property

---

[4] A colocation or "colo" is a secured hosting facility which rents space ("cabinets") for customers to house their own servers.

5

when invoice is paid in full."

21. The ART Defendants paid the May and June 2013 invoices in full. Although they did not pay the July 2013 invoices, these invoices were related to the migration of email and three marketing websites – not the Programs. The transfer of the Programs was completed in June 2013.

22. After Mr. Deshpande assisted with the migration of the Programs he made a very small modification to the source code and provided some add-ons for ART Defendants' use. And, Mr. Lozing stayed on doing work for ART Defendants for about two years, also making some modifications or additions to the Programs.

23. The parties' dealings, however, did not end there. Defendants did not go away. Instead, shortly after the migration was completed, Defendants sued Xtomic and Mr. Ferguson in state court, claiming, among other things, ownership of the Programs. Xtomic subsequently filed the action before this Court.

## II.  CONCLUSIONS OF LAW[5]

### A.  Subject matter jurisdiction.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### B.  Defendant Art Business Solutions, LLC

ART Business is no longer functioning and no evidence was presented by any party that ART Business used any of the Programs. Moreover, during closing argument, Defendants stated they are only contending that ART LLC and ART Corporate have implied licenses to the Programs. On this record, the Court finds no implied license was granted to ART Business in either of the Programs. This leaves ART Defendants.

---

[5] To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated herein by reference as conclusions of law.

### C. Implied Nonexclusive Licenses and the *Effects* Test

ART Defendants contend they have perpetual, nonexclusive, royalty-free implied licenses to the Admin Program and EPN Program. A "nonexclusive license may be granted orally, or may even be implied from conduct." *A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); 3 Nimmer on Copyright § 10.03[A] (2018). The implied-license exception to the requirement of a writing is a limited one. *See Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). Where a nonexclusive implied license exists, the creator or licensor of the work does not transfer ownership of the copyright to the licensee but "simply permits the use of a copyrighted work in a particular manner." *Shaver*, 74 F.3d at 775.

To determine whether an implied license exists, many courts apply what has come to be known as the *Effects* test. Under this test, an implied license may be found where "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Shaver*, 74 F.3d at 776 (citing *Effects*, 908 F.2d at 558-59); *see also Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (same). The existence of an implied license is an affirmative defense to a claim of copyright infringement, in which the alleged infringers bear of the burden of proof. *Shaver*, 74 F.3d at 775; *Effects*, 908 F.2d at 559.

The Tenth Circuit has not adopted the *Effects* test but the parties agree that it is determinative of the issues here. Thus, the Court examines the *Effects* factors in light of the evidence at trial.

***Request.*** Xtomic did not create the Programs on its own initiative; instead, Xtomic created them at Dr. Leahy's request for his companies. The Admin Program was specifically

created and tailored for ART LLC's seminar business and the EPN Program was specifically created and tailored for ART Corporate's work-place services. Over time, Xtomic modified or updated the Programs at ART Defendants' request to meet various business needs. And, ART Defendants paid Xtomic for its work in creating, modifying, updating, and maintaining such Programs. Thus, this factor is met. *See Gagnon*, 542 F.3d at 755 (plaintiff "requested" program where defendant created them at plaintiff's request, defendant made changes in response to plaintiff's request, and plaintiff paid defendant to do such work).

*Delivery.* Xtomic concedes that in 2013[6] it actually delivered the source code to Mr. Deshpande but apparently contends such delivery, under the facts and circumstances here, was not the "delivery" required to create an implied license under the law. The Court disagrees.

Here, Mr. Ferguson testified Xtomic felt pressured, Mr. Lozing was not the politest and neither was Dr. Leahy's son. Nonetheless, Xtomic knew how to withhold providing the source code because it did so at least as to the EHR Service Application; Xtomic refused to provide the source code until the state court ordered it to do so in the state court action. Here, while initially reluctant, Xtomic ultimately did so. Xtomic cooperated with Messrs. Deshpande and Lozing in transferring the source code to ART Defendants. Thus, the Court finds Xtomic delivered the Programs to ART Defendants.

*Objective Intent.* The "intent" at issue is "the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." *Gagnon*, 542 F.3d at 756. Factors which a court may consider to determine intent include "(1) whether the parties

---

[6] As to what occurred during the 2008 breakup, Mr. Ferguson testified in the state court proceeding the source code was given to Defendants. Mr. Ferguson's testimony here, however, is that he was mistaken; the source code was not given to Defendants. Mr. Varney, who wrote both Programs, testified Mr. Ferguson would have had to get the code from him (Mr. Varney) and the code was never given. In light of the Court's findings concerning the events in 2013, it need not resolve whether Xtomic delivered to Art Defendants only the data or the data and the source code in 2008.

were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts … providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003) (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002)); *Gagnon*, 542 F.3d at 756.

The Court finds the objective facts point toward the existence of an implied license. First, Xtomic and ART Defendants had an ongoing service relationship where Xtomic, after creating the Programs, provided ongoing support for the Programs. The Court finds, however, the relationship of the parties indicates neither an intent to grant nor deny a license without Xtomic's future involvement. Xtomic's conduct during the delivery of the source code for the Programs, however, is a different matter.

After the delivery of the source code and databases, Xtomic sent invoices which show its objective intent to grant ART Defendants' implied licenses. The final invoices expressly stated that "All source code and images created by Xtomic and used by the client become the client's property when invoice is paid in full." While Mr. Ferguson testified that he intended this language to apply to websites Xtomic was migrating for ART Defendants, the Court is not persuaded by his testimony and, further, it is the objective intent which controls. Instead, the Court concludes the invoices, when considered in conjunction with the parties' conduct, show that ART Defendants, upon payment, would own their copies of the Programs, as licensees. ART Defendants would not own the Programs outright, as further supported by Xtomic's retention of the source code in its possession. As the Court previously found, Xtomic owns the copyrights to

such Programs.

That ART Defendants have implied licenses does not mean *both* of them have implied licenses for *both* Programs. First, the Court finds Dr. Leahy's testimony was not credible in several instances; he appeared confused and his testimony is contradicted by other evidence which the Court finds more credible. Next, while the evidence was muddied by collective references to "ART," the ART companies and the like, the Court finds the Admin Program was created for the seminars side of the business, i.e. ART LLC, while the EPN Program was created for the corporate side of the business, ART Corporate. These Programs were created as tools for specific aspects of each business. In other words, each Program was specific to one "unique" side of the business, run by a specific ART Defendant. Finally, those entities used their respective Programs; there is no evidence they used each other's Programs or both Programs. Accordingly, the Court finds ART LLC has an implied license to the Admin Program and ART Corporate has an implied license to the EPN Program.

***Scope of the Licenses.*** An implied license protects the licensee only to the extent "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998). ART Defendants contend that, by Xtomic's failure to provide specific limitations on what they may do with the license, they have a perpetual implied license to do anything they wish with the licenses, i.e., use, copy, display, perform, develop, sublicense, and otherwise exploit the Programs in perpetuity, without restrictions. The Court agrees the implied license is perpetual, but finds the licenses are not as broad as Defendants claim.

The Court starts with who bears the burden on this issue. Defendants argue Xtomic bears the burden; Xtomic argues a negative inference should not be drawn based on its silence as to the

scope or limitations. On the record at hand, the Court finds Xtomic bears the burden. *See Gagnon*, 542 F.3d at 757 (stating "Gagnon had to express an intent to retain control over the programs and limit AMS's license if he intended to do so"); *Boatman v. United States Racquetball Ass'n*, 33 F. Supp. 3d 1264, 1271 (D. Colo. 2014) ("[D]efendant only bears the burden of proving the existence of a license granted to it; the plaintiff bears the burden of proving that the defendant's use of a copyrighted work exceeded the scope of that license."); *Signorelli v. N. Coast Brewing Co. Inc.*, No. 5:18-CV-02914-EJD, 2019 WL 2569582, at *3 (N.D. Cal. June 21, 2019) ("The burden was on Eduardo [licensor] to express an intent to limit the scope of the implied license at the time the license was granted."). However, the Court finds it need not reach the issue of whether a negative inference may be drawn by Xtomic's failure to specifically state any limitations because the parties' actions spoke as loudly as words.

In this case, the evidence shows Xtomic intended that ART Defendants have use of the Programs. But, the parties' course of conduct shows *the use is limited to how it had been used historically*.[7] As Mr. Lozing testified, ART Defendants would continue to run with the applications as ART Defendants had been running them. And, indeed, ART Defendants did so.[8] Mr. Lozing continued to do work for ART Defendants for about two years after the transfer and while they made some modifications and changes, there is no evidence that they did anything else, e.g., copy or sublicense the Programs. Further, Xtomic retained – and still retains – the source code it created.

---

[7] During closing arguments, Defendants argue they shared employees, shared office spaces, and shared resources, including the sharing of the Programs. Why this argument is in the record, this *evidence* is not. The Court finds no credible evidence the Programs were shared between the ART Defendants, or that the ART Corporate employees used the Admin Program for the corporate side of the business.

[8] Although, as stated, the Court need not decide if the source code was transferred in 2008, if it had been transferred as Defendants argue, this would further support the conclusion that the licenses were meant to be used solely by ART Defendants and not for sale or otherwise. After all, that was the only use at all times. And, if the Court had to decide the issue, it would decide this in favor of Xtomic. The Court finds Mr. Varney's testimony to be the most credible on this issue.

Accordingly, the Court finds ART LLC and ART Corporate have a non-exclusive, royalty-free license to retain and use the Admin and EPN Programs, respectively, and may modify and make changes to the Programs for *their respective use*. Their respective licenses, however, extend no further. For example, they may not copy the Programs and share it with each other or with others, whether such sharing is for profit or gratuitous. They may not sublicense the Programs, even to a related entity.

As to whether such license is perpetual, Xtomic has not shown otherwise. Here, the ART Defendants paid consideration for the Programs – those final invoices. Therefore, these licenses are irrevocable, i.e., they are granted in perpetuity. *Gagnon*, 542 F.3d at 757 (citations omitted).

### III. ORDER

Based on the foregoing, the Court **ORDERS** as follows:

(1) That Defendant Art Business Solutions, LLC does not have an implied license in either the Admin Program or EPN Program;[9]

(2) That Defendant Active Release Techniques, LLC has a perpetual, royalty-free non-exclusive license in the Admin Program to be used solely in conjunctive with its business, including modifying or changing the Program for its use; that it may not use such license in any other respects such as copying, sub-licensing, or otherwise allowing it to be used by others; and

(3) That Defendant ART Corporate Solutions, Inc. has a perpetual, royalty-free non-exclusive license in the EPN Program to be used solely in conjunctive with its business, including modifying or changing the Program for its use; that it may not use such license in any other respects such as copying, sub-licensing, or allowing it to be

---

[9] By this Order, the Court is not finding that ART Business Solutions, LLC is liable for copyright infringement of the Programs. The parties agreed the issue to be tried was whether Defendants had an implied license to the Programs.

used by others; and

(4) That, on or before June 8, 2020, the parties shall file a joint status report regarding Phase II of this case.

DATED this 18th day of May, 2020.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge